Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez,
a la que se unen el Juez Presidente Señor Hernández Denton y la Jueza Asociada Señora Fiol Matta.
Permitir que los que ejercen el po-der determinen la exclusión del de-recho al voto de sus adversarios es invitar a la destrucción de la democracia. Por ello la independen-cia de los tribunales que revisan los asuntos electorales es de vida o muerte en una democracia.(1)
A sólo horas de comenzar el evento que cada cuatrienio marca nuestro renovado compromiso democrático, la ma-yoría de este Tribunal arroja sombras sobre su legitimidad, al cambiar, sin base jurídica alguna, las reglas de juego. Con este dictamen, se contribuye a la turbidez sobre los *214 resultados de esta elección y se lacera, de paso, la con-fianza ciudadana en esta institución. Confianza, que es también baluarte democrático porque se asienta sobre la base de que somos prudentes e imparciales en el ejercicio del vasto poder que la Constitución del Estado Libre Aso-ciado de Puerto Rico nos ha delegado. El Juez Brandéis, con sabiduría, aseveró lo siguiente sobre el Tribunal Supremo de Estados Unidos, y bien valdría que se asumiera su admonición: "The most important thing we do is not doing”. A. Bickel, The Least Dangerous Branch, Indianapolis, Bobbs-Merrill, 1962, pág. 71.
Disiento del curso que traza la mayoría por varias razo-nes: primero, porque no se basa en una interpretación co-herente del Código Electoral de Puerto Rico para el Siglo XXI, ni del Reglamento para las Elecciones Generales y el Escrutinio General de 2012 y el Manual de Procedimiento para las Elecciones Generales, la Consulta sobre el Estatus Político de Puerto Rico y el Escrutinio General; segundo, porque es contraria al principio legal que propone que las interpretaciones de los entes administrativos merecen nuestra deferencia; tercero, porque legislamos sin que este Tribunal haya dictaminado que se han violado derechos de rango constitucional; cuarto, porque tan tardío dictamen es irreflexivo; quinto, porque el mandato de la mayoría se asienta sobre unos argumentos del peticionario de posible fraude electoral, asunto sobre el cual no hay un ápice de prueba en el expediente; sexto, porque tal cual nos indica la Comisión Estatal de Elecciones (CEE), la orden que hoy emite la mayoría trastoca el cuidadoso esquema estable-cido y que históricamente se ha utilizado para la votación, proceso éste cuya esencia es evitar confrontaciones en el colegio de votación.
Estamos ante otro esfuerzo más de la mayoría para li-mitar los derechos de los ciudadanos, en este caso uno de los más preciados en la democracia: el derecho al voto. La *215 acción de la mayoría abre las puertas las puertas a la su-presión de electores (“voter suppression”) válidamente inscritos. En la actualidad este fenómeno se está viviendo en Estados Unidos.
Innumerables estados (Le., Ohio, North Carolina, Florida, Wisconsin, Arizona, Mississippi, Alabama, Texas, etc.) y sus funcionarios administrativos, han promulgado medidas dirigidas a impedir, restringir o limitar el sufragio cuyo efecto es intimidar a votantes que no son afines a su partido político. Véanse, entre otros: A. Keyssar, Voter Suppression Returns: Voting Rights and Partisan Practices, Harvard Magazine, July-August (2012); J. Mayer, The Voter-Fraud Myth: The Man who Stoked Fear about Impostors at the Polls, The New Yorker, October 29, 2012. Tan serio es el problema, que el Departamento de Justicia de Estados Unidos ha asumido un rol proactivo revisando e impugnando judicialmente varias de estas medidas. Eric Holder, mensaje pronunciado en el Lyndon Baines Johnson Presidential Library and Museum, 13 de diciembre de 2011.
En un estudio del Brennan Center for Justice, J. Levitt concluye:
Allegations of widespread voter fraud, however, often prove greatly exaggerated. It is easy to grab headlines with a lurid claim (“Tens of thousands may be voting illegally!”); the follow-up —when any exists— is not usually deemed newsworthy. Yet on closer examination, many of the claims of voter fraud amount to a great deal of smoke without much fire. The allegations simply do not pan out.

These inflated claims are not harmless. Crying “wolf” when the allegations are unsubstantiated distracts attention from real problems that need real solutions...

Moreover, these claims of voter fraud are frequently used to justify policies that do not solve the alleged wrongs, but that could well disenfranchise legitimate voters. (Énfasis suplido). J. Levitt, The Truth About Voter Fraud, Brennan Center for Justice at New York University School of Law, 2007, pág. 3.
*216 El fenómeno antes descrito se ejemplifica en la contro-versia de autos y la mayoría de este Foro se hace partícipe de ello.
Una mayoría de este Tribunal parece aplicar un enfoque circunstancial en lugar de estatutario y reglamentario a la controversia de autos. A sólo tres días de los próximos co-micios electorales la “pulcritud del sistema electoral de Puerto Rico es blanco de ataque”, Opinión per curiam, pág. 202, y lamentablemente la mayoría contribuye a este em-bate con su orden emitida. “Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls”. Purcell v. González, 549 U.S. 1, 4-5 (2006). Es por ello que no es aconsejable dictar una orden como la de hoy a sólo horas de una elección. Colón-Marrero et al. v. Conty Pérez et al., Op. de 2 de noviembre de 2012, Civil No. 12-2145. Nuevamente, la confianza de la ciuda-danía en este Foro como último recurso para vindicar el derecho al voto y proveer objetivamente de un remedio justo y equitativo, queda irremediablemente mancillada.
Hoy se desfigura el estado de derecho. Somos testigos de una interpretación forzada, torcida, y, repetimos, circuns-tancial que no se ajusta a las exigencias ético-jurídicas de un tribunal. El proceder mayoritario permite que otros concluyan que se ingenia una solución levemente articu-lada que ante peticionarios anónimos, no se idearía. Todo lo cual es motivo de honda preocupación ante el adveni-miento de unos nuevos comicios electorales.
En la controversia de autos, hasta la mirada párvula de quien tiene a su alcance tanto el Código Electoral de Puerto Rico para el Siglo XXI, 16 L.P.R.A. sec. 4001 et al., como el Reglamento para las Elecciones Generales y el Es-crutinio General de 2012 y el Manual de Procedimiento para las Elecciones Generales, la Consulta sobre el Estatus Político de Puerto Rico y el Escrutinio General, podría con-cluir que el comisionado electoral del Partido Nuevo Pro-gresista (PNP), aquí peticionario, no le asiste la razón.
*217 I
La controversia de autos es sencilla, tal cual su solución, puesto que el Código Electoral y el Reglamento para las Elecciones Generales y el Escrutinio General de 2012 (Re-glamento para las Elecciones Generales) disponen clara-mente de un curso a seguir del que se ha distanciado este Tribunal hoy. El PNP solicita que autoricemos que las lis-tas de electores inactivos en el Registro Electoral (conoci-das como “listas de electores inactivos 1-8”) sean entrega-das a todas las unidades y colegios electorales donde van a votar los electores que utilizan el procedimiento de voto añadido a mano.(2) Tal pretensión persigue que los funcio-narios a cargo de estos colegios no les permitan a los elec-tores inactivos 1-8 votar en conformidad con el procedi-miento establecido para los colegios especiales de votos añadidos a mano, a pesar de que dichos electores quizás aparezcan en tales listas 1-8 por error administrativo de la Comisión.
Vista la petición del comisionado electoral del PNP ante la propia Comisión Estatal de Elecciones (CEE), no hubo unanimidad entre los comisionados electorales. Por tal mo-tivo, el presidente de la CEE, Héctor Conty Pérez, emitió la Resolución CEE-12-120 el 26 de octubre de 2012. En ésta concluyó que ante la falta de unanimidad para enmendar el Reglamento para las Elecciones Generales en lo refe-rente a los colegios especiales de electores añadidos a mano, no procedía la solicitud del PNP. Basó su determi-nación en que el Artículo 3.004 del Código Electoral dis-pone que toda enmienda al Reglamento que se adopte a menos de noventa días antes de las elecciones generales, *218 requerirá la participación de todos los comisionados electo-rales y el voto unánime de éstos. 16 L.P.R.A. sec. 4014.
El señor Conty Pérez esbozó el estado de derecho vi-gente y subrayó que la Regla 35 del Reglamento para las Elecciones Generales de 2012 claramente establece que a cada colegio especial de electores añadidos a mano le serán enviadas solamente las listas de votantes activos y las lis-tas de votantes excluidos. Al no disponer que se deban en-viar las listas de votantes inactivos 1-8, la petición del PNP constituiría una enmienda a dicho Reglamento. Además de esto, el Presidente de la CEE fue muy enfático al expresar que los electores inactivos no tienen derecho a votar y que aquéllos que puedan tener derecho a votar y lo hagan me-diante el mecanismo de votos añadidos a mano, deberán seguir los procedimientos en ley. Concluyó diciendo que el incumplimiento de esos procesos o el intento de fraude de quienes no tuvieren derecho a votar, conllevaría las respec-tivas sanciones penales que la ley dispone.
II
A
Lo que está ante nuestra consideración en esta contro-versia son las disposiciones del Código Electoral de Puerto Rico y el Reglamento para las Elecciones Generales, un reglamento que aprobaron los propios comisionados electo-rales que conforman la CEE Cód. Electoral, Art. 3.001, 16 L.P.R.A. sec. 4011.
En innumerables ocasiones hemos sido consecuentes en que las conclusiones e interpretaciones que hagan los or-ganismos administrativos sobre las leyes y reglamentos que administran merecen gran consideración y respeto. Por lo tanto, en tales circunstancias la revisión judicial se limita “a determinar si la agencia actuó arbitraria o ilegal- *219 mente, o en forma tan irrazonable que su actuación constituy[ó] un abuso de discreción”. Rebollo v. Yiyi Motors, 161 D.P.R. 69, 76 (2004). Véase Rivera Concepción v. A.R.Pe., 152 D.P.R. 116, 122 (2000).
En otras palabras, en estos casos el criterio a aplicarse no es si la decisión administrativa es la más razonable o la mejor según el parecer del foro judicial. Todo lo contrario, el criterio rector que esta Curia ha definido es si la deter-minación administrativa, en la interpretación de los regla-mentos y las leyes que le incumbe implementar, es razonable. Rivera Concepción v. A.R.Pe., supra, pág. 124. Ello no constituye una abdicación al poder revisor de los tribunales, sino una deferencia basada en el concepto de la razonabilidad del proceder administrativo. Véase Rebollo v. Yiyi Motors, supra, pág. 78.
Además, es “un principio firmemente establecido que las decisiones de las agencias administrativas tienen a su favor una presunción de legalidad y corrección, la cual de-ben respetar los tribunales mientras la parte que las im-pugna no produzca suficiente evidencia para derrotarlas”. (Énfasis suplido). Rebollo v. Yiyi Motors, supra, pág. 77. En la controversia ante nosotros, la parte peticionaria no ha logrado rebatir esa presunción. Mucho menos ha podido explicar cómo o por qué no debemos seguir, con relación a los Arts. 3.004, 6.012 y 9.015 del Código Electoral, el principio de hermenéutica legal del Artículo 14 del Código Civil de Puerto Rico que tanto profesamos. Entiéndase, el principio de que cuando la ley es clara, no se debe menospreciar su letra. Cód. Civ. Art. 14, 31 L.P.R.A. sec. 14; S.L.G. Rodríguez-Rivera v. Bahía Park, 180 D.P.R. 340, 355 (2010) (Martínez Torres, J., Op. Mayoritaria); Const. José Carro v. Mun. Dorado, 186 D.P.R. 113 (2012) (Rivera García, J., Op. Mayoritaria); Pagán Santiago et al. v. ASR, 185 D.P.R. 341, 357 (2012) (Pabón Charneco, J., Op. Mayoritaria).
*220 La mayoría de este Foro intenta convencer de que el Artículo 6.012 del Código Electoral es claro al equiparar a los electores inactivos con los excluidos. Sin embargo, la claridad opera en contra de su contención, como veremos a continuación.
B
La Constitución del Estado Libre Asociado de Puerto Rico establece un derecho al sufragio universal, lo que sig-nifica un principio amplio de inclusión en la participación en los procedimientos electorales y colectivos. Const. P.R., Preámbulo y Art. II, Sec. 2, L.P.R.A., Tomo 1; P.N.P. v. De Castro Font II, 172 D.P.R. 883 (2007). Ese derecho está reglamentado por medio de leyes especiales como el Código Electoral, que reconoce la importancia del ejercicio del voto. Tanto es así que la ley establece una prohibición al rechazo, a la cancelación, a la invalidación o anulación del elector calificado a su derecho al voto. Cód. Electoral, Art. 6.006, 16 L.P.R.A. sec. 4066. Examinemos a continuación los artículos pertinentes del Código Electoral para resolver la controversia de autos. Comencemos aclarando la inter-pretación errónea que hace la mayoría de la diferencia en-tre los electores inactivos y los excluidos, al equipararlos como una sola clasificación.
La Ley Electoral de 1977 establecía en su Artículo 2.012 que “[s]i un elector dejare de votar en una elección general su nombre será excluido de las listas electorales”. (Enfasis suplido). 16 L.P.R.A. sec. 3062 (derogado). Según esa dis-posición estatutaria derogada por la actual Asamblea Le-gislativa, la interpretación que hoy la mayoría de este Tribunal le confiere al nuevo Código Electoral podía haber prevalecido. Sin embargo, la intención legislativa, cuando se dio a la tarea de crear el Código Electoral de Puerto Rico para el Siglo XXI, cambió dicha expresión de la ley. El Pro-yecto de la Cámara presentado originalmente buscaba en- *221 mendar el Código Electoral, sin el efecto de derogar todas sus disposiciones.
Posteriormente es que la Asamblea Legislativa decidió en efecto presentar y aprobar un Código Electoral nuevo y distinto por completo al anterior. El primer proyecto de ley disponía en la sección que hoy genera esta controversia, la propuesta de enmienda siguiente:
Si un elector dejare de votar en una elección general su [nombre] registro o expediente será [excluido de las listas electorales] inactivado en el Registro General de Electores. La Comisión podrá excluir del mencionado registro a aquellos electores que por causales dispuestas en esta Ley o reglamento así se establezca. Una exclusión no implicará la eliminación de los datos del elector del Registro General de Electores. (Enfasis, corchetes y negrillas en el original). P. de la C. 1863, 16ta Asamblea Legislativa, 2da Sesión Ordinaria, 12 de agosto de 2009, pág. 107.
Como se puede apreciar del texto citado, lo enfatizado entre corchetes y negrillas es lo que el proyecto de la cá-mara propuso eliminar, y el texto en bastardillas es lo que se propuso aprobar. El texto citado despeja cualquier duda con respecto a la intención de la Asamblea Legislativa de cambiar el tratamiento a los electores que dejaran de votar en una elección general. Anteriormente dicho elector se te-nía que excluir de las listas electorales, mas la enmienda propuesta sólo buscó “inactivarlo” en el Registro General de Electores.
Tras ello, la Comisión de Gobierno de la Cámara de Re-presentantes presentó un Proyecto Sustitutivo de la Cá-mara al P. de la C. 1863. Ya en este proyecto la Asamblea Legislativa vislumbró la eliminación del antiguo Código Electoral, para aprobar y adoptar un nuevo Código Electoral. En ese proyecto sustitutivo, la Asamblea Legis-lativa propuso, con respecto a la disposición estatutaria en controversia en este caso, el texto siguiente:
Si un elector dejare de votar en una elección general su re-gistro o expediente podrá ser inactivado en el Registro Gene *222 ral de Electores. La Comisión podrá excluir del mencionado registro a aquellos electores que por causales dispuestas en esta Ley o reglamento así se establezca. Una exclusión no im-plicará la eliminación de los datos del elector del Registro General de Electores. Sustitutivo de la Cámara al P. de la C. 1863 de 8 de marzo de 2010, pág. 77.
El texto propuesto por el proyecto sustitutivo, nueva-mente presenta un trato distinto a lo que establecía la Ley Electoral de 1977. La Asamblea Legislativa propuso inac-tivar al elector, un tratamiento claramente diferente al de la exclusión que existía antes.
Por último, el texto aprobado por la Asamblea Legisla-tiva y firmado por el Gobernador como el Código Electoral de Puerto Rico para el Siglo XXI dispone lo siguiente en su Artículo 6.012:
Si un elector dejare de votar en una elección general su re-gistro o expediente será inactivado en el Registro General de Electores. La Comisión podrá excluir del mencionado registro a aquellos electores que por causales dispuestas en este sub-título o reglamento así se establezca. Una exclusión no impli-cará la eliminación de los datos del elector del Registro General de Electores. Cód. Electoral, Art. 6.012, supra.
La letra de la ley y la intención legislativa no pueden ser más claras hacia la distinción entre inactivo y excluido. Con intención precisa la Asamblea Legislativa decidió eli-minar del verbo excluir a los votantes que no participaran en unas elecciones generales, para así darles un trata-miento distinto y solamente catalogarlos como inactivos en el Registro General de Electores. La mayoría parece haber leído la Ley Electoral de 1977 para justificar su interpre-tación errada, puesto que emite una falsa enunciación del estado de derecho al decir que los electores inactivos “tam-bién son electores excluidos del registro electoral”. Opinión per curiam, pág. 209. La letra de la ley es clara: los electo-res que aparecen en las listas 1-8 son electores inactivos, mas no excluidos. Aunque el Artículo 6.012 se exprese so-bre ambos en un mismo párrafo, ello no los equipara.
*223 El tratamiento de exclusión se limitó a “aquellos electo-res que por causales dispuestas en este subtítulo o regla-mento así se establezca”. Cód. Electoral, Art. 6.012, supra. La pregunta que debemos hacernos es: ¿cuáles son esas causales? Estas, pues, son los votantes ausentes o adelan-tados, que al día de las elecciones ya han emitido su voto y, por consecuencia, no pueden votar ese día y se excluyen del Registro General de Electores para evitar el doble voto y el verdadero fraude electoral. Además de esos electores, el Artículo 6.017 del Código Electoral dispone que serán ex-cluidos del Registro General de Electores aquellas perso-nas recusadas por las causales que dicho artículo provee. 16 L.P.R.A. sec. 4077. Entre esas causales para recusación, no se encuentran los electores que no hayan votado en las elecciones generales anteriores.
Visto el historial legislativo referente al Artículo 6.012 del Código Electoral, resulta forzoso concluir que la inten-ción legislativa fue no brindar a los electores que dejaran de votar en una elección general el mismo trato que a los electores excluidos. La Asamblea Legislativa separó ambas clasificaciones, contrario a lo que la mayoría de este Tribunal argumenta en un intento forzado de decir por fíat judicial lo que la Rama Legislativa claramente no dijo.
Resulta contradictorio que a pesar de las expresiones que este Tribunal recientemente ha hecho en cuanto al principio de separación de poderes y de evitar que la Rama Judicial asuma un rol legislativo cuando la intención legis-lativa es clara e inequívoca, hoy la mayoría de esta Curia que se ha manifestado así incida en su propia crítica. Lozada Sánchez et al. v. JCA, 184 D.P.R. 898 (2012) (Martínez Torres, J., Opinión mayoritaria); S.L.G. Rodríguez-Rivera v. Bahía Park, supra (Martínez Torres, J., Opinión mayoritaria); Cía. Turismo de P.R. v. Mun. de Vieques, 179 D.P.R. 578, 593-604 (2010) (Pabón Charneco, J., Opinión disidente); Pueblo v. Rivera Santiago, 176 D.P.R. 559 (2009) (Pabón Charneco, J., Opinión mayoritaria). La falta *224 de coherencia de la mayoría en sus propios postulados pa-rece ser aleatoria y hasta circunstancial.
Aclarado que sí hay una distinción entre elector inactivo y elector excluido, revisemos las demás disposiciones del Código Electoral y del Reglamento para las Elecciones Ge-nerales atinentes a esta controversia.
El Artículo 9.015 del Código Electoral establece que
[e]n cada precinto, centro de votación o unidad electoral con-forme disponga la Comisión se establecerá un colegio especial para electores que no hayan sido incluidos en las listas de votantes y reclamen su derecho al voto. La Comisión estable-cerá mediante reglamento los requisitos y procedimientos para este colegio especial donde los electores reclamen que no aparecen incluidos en la lista de votantes correspondiente a su centro de votación por errores administrativos atribuibles a la Comisión. (Enfasis suplido). Cód. Electoral Art. 9.015 (16 L.P.R.A. sec. 4155).
Además, el Artículo 9.042 dispone que “[1]as personas que reclamen su derecho a votar pero no figuren en las listas de votantes podrán votar añadidos a mano según el procedimiento que establezca la Comisión por Regla-mento”. Art. 9.042 (16 L.P.R.A. sec. 4182). En lo pertinente, la Regla 35 del Reglamento para las Elecciones Generales dispone:
En cada centro de votación se establecerá un colegio especial... para que voten solamente los electores del precinto que reclamen su derecho a votar y no figuren en las listas de vo-tación ni en las de exclusiones. Podrán ejercer su derecho al voto en este colegio... solamente los electores que por errores administrativos de la Comisión no aparezcan en las listas electorales. (Enfasis suplido). Reglamento para las Elecciones Generales, R. 35.
Como correctamente señaló el señor Conty Pérez en la resolución de la CEE, esta Regla 35 no faculta la entrega de las listas de votantes inactivos 1-8 a los colegios especia-les de votos añadidos a mano. Veamos ahora más profun-damente qué listas son las que hay que enviar a los centros de votación el día de las elecciones generales.
*225 Primeramente, notamos que el Artículo 9.013 del Có-digo Electoral establece que la CEE entregará a cada par-tido político que postule un candidato a gobernador una copia de la lista de votantes a ser usada el día de las Elec-ciones Generales. 16 L.P.R.A. sec. 4153. Por su parte, el Artículo 2.003 del Código Electoral define la lista oficial de votantes como el “ [d] ocumento impreso o electrónico prepa-rado por la Comisión que incluye los datos requeridos por ley de los electores hábiles asignados a un colegio de vota-ción para una elección en particular”. 16 L.P.R.A. sec. 4003(41).
Del texto claro de la propia ley se deduce que los parti-dos no tendrán el día de las elecciones las listas de electo-res inactivos 1-8 que pretende el PNP obtener en esta ocasión. Visto esto, más que una enmienda al Reglamento para las Elecciones Generales, la pretensión de la parte peticionaria constituye una enmienda al texto claro del Có-digo Electoral sin el debido procedimiento legislativo que provee la Constitución de Puerto Rico. Conceder el remedio solicitado por el PNP diáfanamente puede calificarse como un acto de enmienda legislativa por fíat judicial, sin justi-ficación plausible para ello.
La Regla 18 del Reglamento para las Elecciones Gene-rales dispone que se entregarán a los partidos políticos: las listas de los votantes; copia electrónica del Registro General de Electores; lista alfa unidad de electores activos; lista alfa precinto de electores activos; lista alfa municipal de electores activos, y tarjetas informativas para todos los electores hábiles. Además, la Regla 18 establece que se en-tregarán a las subjuntas de unidad y colegios de votación, entre otras no pertinentes a esta controversia, las listas.de electores excluidos.
La mencionada Regla 18 no dispone nada sobre la en-trega de las listas de electores inactivos 1-8 a los partidos políticos ni a las subjuntas de unidad o colegios de votación. Por consiguiente, acceder a la petición del PNP *226 no tan sólo constituye una enmienda a la Regla 35 del Re-glamento para las Elecciones Generales, sino también a esta Regla 18. Por ser una enmienda que se realizaría den-tro del intervalo de noventa días previo a los comicios elec-torales del 6 de noviembre de 2012, se requería el voto unánime de los comisionados electorales. Cód. Electoral, Art. 3.004, supra. Evidentemente ello no sucedió.
III
La pretensión del comisionado electoral del PNP es que autoricemos el envío de las listas de electores inactivos 1-8 a los colegios electorales para que los funcionarios de los colegios especiales puedan rechazar al momento a aquellos electores inactivos que se presenten a votar el próximo 6 de noviembre. Esta petición que hoy adopta la mayoría de este Tribunal claramente violaría el derecho al voto de mu-chos ciudadanos.
Tanto el PNP en su recurso de certificación intrajuris-diccional, como el Artículo 9.015 del Código Electoral y la Regla 35 del Reglamento para las Elecciones Generales ex-presan que podrán ejercer el derecho al voto en los colegios especiales de votos añadidos a mano aquellas personas cu-yos nombres no aparezcan en las listas electorales debido a errores administrativos atribuibles a la Comisión. 16 L.P.R.A. sec. 4155.
El andamiaje legal electoral de Puerto Rico reconoce que las listas electorales pueden contener errores adminis-trativos al no incluir en éstas a aquellos electores que aun-que siguieron el trámite requerido para quedar inscritos antes de la fecha límite, sus nombres están ausentes de las listas de electores hábiles o aún aparecen en listas de inactivos. Como garantes del derecho constitucional al su-fragio de esos electores, no debemos permitir que unos fun-cionarios electorales, movidos por la pasión que produce el día de las elecciones o por otros motivos, rechacen el ejer- *227 cicio del voto de aquellos que tengan que votar en un cole-gio especial de votos añadidos a mano en razón de que sus nombres aparezcan por error administrativo de la CEE aún en las listas de no activos.
Como mencionamos al inicio, todo elector calificado tiene derecho a votar y no se le puede prohibir ejercer tal derecho. Cód. Electoral Art. 6.006, supra. Permitir que por un error administrativo en las listas 1-8, en el día de las elecciones generales un funcionario electoral deniegue uni-lateralmente el derecho al voto de un elector sin constatar de manera fehaciente su calificación como elector regis-trado o calificado, constituye tanto una violación al derecho constitucional al voto como al debido proceso de ley de ese elector. Para contrarrestar esa posibilidad, tanto el Código Electoral como el Reglamento para las Elecciones Genera-les proveen que a los colegios especiales de votos añadidos a mano no les sean suministradas las listas de electores inactivos.
El propósito de establecer el procedimiento del voto aña-dido a mano es evitar confrontaciones entre los electores y los funcionarios de colegio. Se trata de no abonar, como parece favorecer la mayoría de este Tribunal, más desaso-siego y fricción a un ambiente tenso, lo que podría devenir en sucesos violentos durante los comicios electorales.
El derecho de los electores que son víctima de los erro-res administrativos queda totalmente protegido si se sigue el procedimiento actual establecido por reglamento para los votos añadidos a mano: estos votos se colocan en sobres especiales con la información del elector en la parte ex-terna del sobre y no se cuentan sino hasta comprobar el estatus electoral de la persona que lo emitió. Manual de Procedimiento para las Elecciones Generales de 6 de no-viembre de 2012, Secs. 14-16.(3)
*228 Así el elector puede ejercer su derecho a pesar del error administrativo y su voto se podrá contabilizar cuando se subsane dicho error. Permitir lo que propone el PNP, ava-lado por la mayoría de esta Curia, equivaldría a brindarles la prerrogativa a los funcionarios de colegio a rechazar el ejercicio al voto de toda aquella persona que sea víctima del error administrativo de la Comisión.
Para atender los argumentos de fraude del PNP sobre la avalancha de electores inactivos que ejercerán un voto sin que haya un filtro que se los prohíba, la propia Resolución de la CEE señala los parámetros en ley que fungen como salvaguarda para tales circunstancias. El mecanismo pro-visto es que los electores añadidos a mano deben firmar una declaración jurada en la que hagan constar que tienen derecho a votar a pesar de que su nombre no aparece en la lista de votación. Aquéllos que a sabiendas de que no han cumplido con los requisitos para activarse intenten ir a votar a un colegio especial de votos añadidos a mano, en-frentarán el andamiaje jurídico-penal que provee tanto el Código Electoral como el Código Penal de Puerto Rico.
IV
Como mencioné al inicio, la controversia de autos es sencilla, pues la ley electoral es clara y libre de toda ambi-güedad al catalogar a los electores inactivos separada-mente de los excluidos. El escenario ante nuestra conside-ración es que el ordenamiento jurídico electoral vigente provee las salvaguardas adecuadas para proteger el dere-cho al voto de aquellos electores afectados por los errores administrativos de la CEE Asimismo, el actual Código *229 Electoral faculta que aquellas personas que no tengan de-recho a votar no afecten el resultado de aquellos que sí son hábiles para ello.
Es preocupante que a tres días de las elecciones genera-les del próximo martes la mayoría de esta Curia esté arro-jando sombras sobre la pulcritud, transparencia e integri-dad del proceso electoral. El pueblo de Puerto Rico espera mucho más de aquellos que tenemos la responsabilidad constitucional de velar por el ejercicio de los derechos de la ciudadanía y garantizar el derecho fundamental al sufragio. Con este dictamen pierde la democracia puertorriqueña. Si nosotros como Tribunal no somos capa-ces de hacer cumplir el texto del Código Electoral y el Re-glamento para las Elecciones Generales, nuestra imagen ante el País queda totalmente debilitada.

 Cámara de Representantes, Informe Positivo sobre el Sustitutivo del Pro-yecto de la Cámara 1863, 8 de marzo de 2010, pág. 17, citando la Ponencia del Ledo. Héctor Luis Acevedo ante la Comisión de Gobierno de la Cámara de Representantes sobre el P. de la C. 1863 de 22 de septiembre de 2009, pág. 23.

 Recordemos que los electores inactivos son aquéllos que dejaron de votar en la elección general anterior. Cód. Electoral Art. 6.012 (16 L.P.R.A. sec. 4072). No deben confundirse éstos con los electores que aparezcan en las listas de excluidos, a quienes les aplican otros criterios. Íd.; 16 L.P.R.A. sec. 4077.

 Es infundado el temor a que los electores voten a través del procedimiento de “añadido a mano” sin tener derecho a ello. Los votos añadidos a mano no se cuentan el día de la elección general junto con el resto de los votos de electores hábiles, sino que son contabilizados después de ser evaluados por la CEE en un procedimiento de *228 escrutinio general. Manual de Procedimiento para las Elecciones Generales de 6 de noviembre de 2012, Secs. 14-16. Por lo tanto, encontramos infundado y especulativo el alegado temor de la parte peticionaria, cuando históricamente se ha probado que este procedimiento provee un mecanismo seguro para evitar el voto doble y el fraude electoral, a la vez que garantiza un debido proceso de ley y el derecho al voto de los puertorriqueños.